IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,128

STATE OF KANSAS,
*Appellee*,

v.

CARLOS R. BATES,
*Appellant*.

SYLLABUS BY THE COURT

1.

The Fourth Amendment to the United States Constitution protects the right of an individual to be secure and not subject to unreasonable searches and seizures by the government. Section 15 of the Kansas Constitution Bill of Rights offers the same protections. Under the Fourth Amendment and section 15, any warrantless search or seizure is presumptively unreasonable unless it falls within one of the few established and well-delineated exceptions to the warrant requirement.

2.

One exception to the warrant requirement of the Fourth Amendment to the United States Constitution is an investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). This exception applies to brief investigatory stops of persons or vehicles that fall short of traditional arrest. For this exception to apply, an investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.

3.

The reasonable suspicion standard requires consideration of the totality of the circumstances—the whole picture. Based on that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. A mere hunch is not enough to be a reasonable suspicion. But the particularized basis need not rise to the level of probable cause, which is the reasonable belief that a specific crime has been committed and that the defendant committed the crime.

4.

Appellate courts apply a well-settled, bifurcated standard of review when reviewing a district court ruling on a motion to suppress. Under the first part of the standard, an appellate court reviews a district court's factual findings to determine whether they are supported by substantial competent evidence. Substantial competent evidence is defined as such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. Appellate courts do not reweigh the evidence or assess credibility of witnesses when assessing the district court's findings. Under the second part of the bifurcated standard of review, appellate courts review de novo the district court's conclusion of law about whether a reasonable suspicion justifies the investigatory detention.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 29, 2021. Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed July 29, 2022. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Julie A. Koon*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.: This appeal arises after police detained Carlos R. Bates while he sat in a minivan in an alleyway. The detention followed a series of events that began with a late-night 911 call reporting an unwelcomed knocking on the door of a home. An officer quickly arrived, and an occupied minivan parked near the home drove away. Another officer then spotted the minivan in a nearby alleyway and turned on emergency lights and blocked the minivan from leaving. When both officers reached the alleyway, they approached the vehicle. Smelling marijuana, the officers conducted a search that led to the State charging Bates with possession of drugs and drug paraphernalia with the intent to distribute. Bates sought to suppress evidence obtained during the search because he argued the seizure of the minivan violated his right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights.

The district court judge denied Bates' motion to suppress, concluding the detention was reasonable and justified under the public safety exception to the warrant requirement. Bates appealed, and the Court of Appeals affirmed the denial of the motion to suppress after holding the district court judge correctly denied the motion but used the wrong rationale for doing so. The Court of Appeals rejected the judge's reliance on the public safety exception and instead held the officers held a reasonable suspicion of criminal activity and legitimately conducted a valid investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). See *State v. Bates*, No. 122,128, 2021 WL 301896, at *3-4 (Kan. App. 2021) (unpublished opinion).

3

Upon review, we affirm the Court of Appeals and the district court's denial of Bates' motion to suppress. We hold, as did the Court of Appeals, that the officers had a reasonable suspicion of criminal activity that justified an investigatory detention.

FACTUAL AND PROCEDURAL BACKGROUND

A brief discussion of the procedural background helps frame the issue before us, which is narrower than the issue presented to either the district court or the Court of Appeals. We begin by explaining the procedure that leads us to a limited review of the district court and Court of Appeals decisions.

We first note that we do not have before us the question of whether a police officer seized the minivan parked in the alleyway when he pulled behind it and activated his emergency lights. The parties litigated that question in the district court, and the district court determined a seizure occurred. On appeal, the parties do not dispute that ruling. Likewise, no party raises issues about the legality of the search of the minivan if we determine its seizure was valid. As a result, the single overarching issue is whether the officers' seizure of the minivan violated the Fourth Amendment and section 15.

The trial and appellate process have further narrowed the scope of that single issue. To explain, it helps to keep in mind that the Fourth Amendment protects the right of an individual to be secure and not subject to unreasonable searches and seizures by the government. *State v. Ryce*, 303 Kan. 899, 909, 368 P.3d 342 (2016). Section 15 of the Kansas Constitution Bill of Rights offers the same protections. *Ryce*, 303 Kan. at 909; *State v. Williams*, 297 Kan. 370, 376, 300 P.3d 1072 (2013). Under the Fourth Amendment and section 15, any warrantless search or seizure is presumptively unreasonable unless it falls within one of the few established and well-delineated encounters recognized as a warrant exception. *Ryce*, 303 Kan. at 909.

4

Of the possible exceptions, the district court judge considered two: whether the stop was (1) a valid investigatory detention, also known as a *Terry* stop (and concluded it was not) or (2) a valid public safety stop (and concluded it was). See *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016) (listing some warrant exceptions, including investigative detentions and public safety stops). On appeal, the Court of Appeals considered the same two exceptions but reached the opposite conclusions, holding the detention was not a valid safety stop but was a valid investigatory detention. *Bates*, 2021 WL 301896, at *3-4.

Bates petitioned for review and asks us to reverse the Court of Appeals' holding that the stop was a valid investigatory detention. He does not seek review of the ruling on which he prevailed before the Court of Appeals—that is, that the detention was not a valid public safety stop. It was the State that was adversely affected by that ruling. The State thus had the option of filing a cross-petition or conditional cross-petition for review to ask us to review that portion of the Court of Appeals decision. See Supreme Court Rule 8.03(c)(3) (2022 Kan. S. Ct. R. at 57) ("The purpose of a cross-petition is to seek review of specific holdings the Court of Appeals decided adversely to the cross-petitioner."). But it did not, and the Court of Appeals' holding that the detention was not a valid public safety stop is thus settled in Bates' favor. See *State v. Taylor*, 314 Kan. 166, 168, 496 P.3d 526 (2021).

This narrowing of the issues means we must determine only whether the officers conducted a valid investigatory detention. The district court judge held they did not, and Bates now argues we should defer to both the judge's findings of fact and his conclusion of law on that point. He also argues the Court of Appeals failed to analyze whether the judge's determination of no reasonable suspicion was based on substantial competent

evidence (he contends it was). He also argues the Court of Appeals panel made factual findings to support its conclusion.

Given Bates' contention that the panel engaged in fact-finding, we set out in full the district court judge's findings of fact, omitting his citations to the record:

"1.     On September 1, 2017, Officer Gilmer was dispatched to a 'suspicious character' call at 1906 N. Hood, Wichita, Sedgwick County, Kansas.

"2.     The suspicious character was reported to be knocking on the front door of the residence at that address.

"3.     The report was made by a 9-1-1 call.

"4.     Officer Gilmer had no information about the description of the person or people knocking on the door or any involved vehicles.

"5.     Officer Gilmer arrived in the area of 1906 N. Hood shortly after the 1:27 a.m. 9-1-1 call.

"6.     Officer Gilmer observed a red mini-van parked on the street in front of or near the house at 1906 Hood.

"7.     The red mini-van appeared to be running and the lights were on.

"8.     Officer Gilmer saw no one outside the vehicle.

"9.     It was dark outside.

"10.     Officer Gilmer did not have his emergency overhead lights or sirens on when he arrived in the area of 1906 N. Hood.

"11.     Officer Gilmer approached the vehicle on foot and shined his flashlight onto the vehicle. He did not recall having used his police car's overhead flashing lights up to this point.

6

"12.     Officer Gilmer was wearing a green polo shirt and tan pants, and a badged vest.

"13.     The vehicle drove off when Officer Gilmer walked up to the vehicle and shined his flashlight on it.

"14.     Officer Gilmer did not announce himself as 'police' or say 'stop' when he approached the vehicle.

"15.     Officer Gilmer communicated to another police officer to stop the vehicle.

"16.     Officer Gilmer knew the neighborhood to have 'a lot' of larceny to autos, car break-ins, and residential burglaries.

"17.     Officer Oliphant knew the area to have 'a lot of vandalisms . . . lot of burglaries . . . lot of gang activity.'

"18.     Officer Gilmer did not make contact with the 9-1-1 caller or the home prior to approaching the vehicle of interest at either 1906 N. Hood or in the alley.

"19.     Officer Gilmer 'heard' Officer Oliphant stop the vehicle nearby and drove to that location.

"20.     Upon Officer Gilmer's arrival about a minute later he found that the same vehicle which had driven away was now parked in an alleyway with its lights off, about one and a half blocks away from where he first saw it.

"21.     When Officer Gilmer arrived at the alley, Officer Oliphant's police car emergency overhead lights were on.

"22.     Officer Gilmer walked up to the passenger side of the vehicle, made contact with the passenger, and noted an odor of marijuana coming from the vehicle.

"23.     The passenger identified himself as Brown.

"24.     Officer Gilmer has experienced cases of people knocking on a front door and then breaking into the rear of the home if no one answers the door.

"25.     Officer Oliphant did not see people walking outside when he arrived in the area of 1906 N. Hood, prior to the vehicle driving away from Officer Gilmer.

"26.     Officer Oliphant's emergency equipment was not activated when he was approaching 1906 N. Hood and he was not trying to stop the vehicle at that time.

"27.     Officer Oliphant had a suspicion that the vehicle was involved in the door knocking.

"28.     Officer Oliphant found the vehicle parked in an overgrown alleyway with its lights off.

"29.     Officer Oliphant first drove by the parked car, realized he had missed something, then backed up, and activated his emergency equipment. The vehicle of interest had already stopped, parked, and had its headlights turned off when Officer Oliphant turned on his emergency equipment and parked in the street near the alley entrance.

"30.     After Officer Gilmer arrived, both officers walked up to the vehicle.

"31.     Officer Oliphant found it suspicious to be parked in an alley right off the street completely blacked out.

"32.     Other than the occupants of the vehicle, from the time of the arrival of Officers Oliphant and Gilmer in response to the 9-1-1 dispatch and the vehicle 'stop,' they did not observe any other people in the area near 1906 N. Hood.

"33.     Because of the location of the vehicle near 1906 N. Hood, the occupants of the vehicle could have been involved in the door knocking, or they could have been witnesses to it.

"34.     At the beginning of the encounter between the officers and the vehicle in the alleyway, both officers smelled the odor of marijuana coming out of the car.

"35.     The officers did not think that knocking on the door of the residence was a crime."

8

After making those findings, the district court judge concluded: "Officers Oliphant and Gilmer could not have conducted a *Terry* stop because, according to their testimony, they did not believe a crime had been committed, was being committed, or was about to be committed." But the judge also concluded: "They did, however, conduct a reasonable and acceptable community caretaking public safety inquiry, even if they do not refer to it as such." The judge thus denied Bates' motion to suppress.

The case proceeded to a bench trial on stipulated facts. The judge convicted Bates of possession of cocaine with intent to distribute and possession of drug paraphernalia with intent to distribute. Bates appealed.

Before the Court of Appeals, Bates argued the district court relied on facts not in the record to support the public safety justification for the stop because the officers did not testify about concern for the welfare of the minivan's occupants or anyone else. The State disagreed but also suggested an alternative rationale to the Court of Appeals by renewing the argument it had made in district court that the stop was a valid investigatory detention.

The Court of Appeals panel agreed with Bates' arguments about the district court's conclusion the officers conducted a valid public safety stop. It held the stop did not fall within the public safety exception because the officers testified concern for the well-being of the minivan's occupants did not motivate their actions. *Bates*, 2021 WL 301896, at *3. But the panel affirmed the district court as right for the wrong reason because the facts in the record supported a finding that the officers had reasonable suspicion to detain the occupants of the minivan. 2021 WL 301896, at *4. The panel concluded that reasonable inferences derived from the facts gave "rise to a reasonable suspicion that criminal activity was afoot." 2021 WL 301896, at *4. The panel listed seven facts supporting a conclusion that officers could reasonably suspect criminal activity:

9

"Officers Gilmer and Oliphant relied on seven facts when stopping the van: (1) They responded to a report of someone knocking on the front door of a caller's residence; (2) they received the report early in the morning; (3) burglaries were common in the neighborhood; (4) Officer Gilmer stated burglars will sometimes knock on the front door to determine whether someone is home; (5) upon arriving, the officers saw a van parked outside the residence with its lights on; (6) the van drove away as Officer Gilmer approached it; and (7) Officer Oliphant found the van parked with its lights off in an alley 1 1/2 blocks away." *Bates*, 2021 WL 301896, at *4.

The panel included two other statements about facts that Bates contends were fact-finding by the appellate court. First, it discussed the reliability of the information about the 911 call:

"While the officers did not observe the knock, this information was reliable because the caller, by providing the house's address, could be identified and held to account. See *State v. Chapman*, 305 Kan. 365, 373, 381 P.3d 458 (2016) (discussing reliability of tip based on whether identity of provider is disclosed, could be ascertained, or could not be discovered). The caller indicated he did not expect a visitor. Based on the van's location and its lights being on, the officers could reasonably conclude one of the van's occupants was the door-knocker." 2021 WL 301896, at *4.

Second, he argues the following inference drawn by the Court of Appeals conflicts with substantial competent evidence:

"Officer Gilmer's statement describing how some burglars operate tied the knocking to potential criminal activity. The time of the call and the prior illegal activity in the neighborhood strengthened that connection. And after Officer Gilmer attempted to approach the van, it drove away and parked with its lights off in a nearby alley, suggesting its occupants did not want to interact with police." 2021 WL 301896, at *4.

After drawing that inference, the Court of Appeals concluded:

"Individually, these circumstances may simply appear odd. See *Chapman*, 305 Kan. at 372 (report of suspicious but not criminal activity cannot form reasonable suspicion). But in light of Officer Gilmer's description of burglaries, these circumstances become sufficiently suspicious to suggest a crime was going to be committed, warranting an investigatory detention. See *State v. Kirby*, 12 Kan. App. 2d 346, 353, 744 P.2d 146 (1987) (noting 'location, time of day, previous reports of crime in the area, and furtive actions of suspects' may support reasonable suspicion but time of day and crime in the area cannot justify a stop by themselves), *disapproved of on other grounds by State v. Jefferson*, 297 Kan. 1151, 310 P.3d 331 (2013).

"We conclude that, under the totality of the circumstances, the officers' investigatory detention of the van was supported by reasonable suspicion that the occupants intended to commit a burglary." 2021 WL 301896, at *4.

Noting that Bates did not challenge the officers' subsequent search of the minivan, the Court of Appeals affirmed the district court decision to deny the motion to suppress. 2021 WL 301896, at *4.

Bates timely petitioned for review, which this court granted. This court's jurisdiction is proper under K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions), and K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

As we have discussed, the only exception to the warrant requirement that the parties have preserved for our consideration is the one allowing an investigatory detention, also known as a *Terry* stop. This exception applies to "brief investigatory stops

11

of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Recognizing that the "'balance between the public interest and the individual's right to personal security,' . . . tilts in favor of a standard less than probable cause" in a brief investigative stop, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot."'" 534 U.S. at 273 (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 [1989]); see *Terry*, 392 U.S. at 30. For this exception to apply, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

The Kansas Legislature has codified this exception in K.S.A. 22-2402: "Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions." See *State v. Doelz*, 309 Kan. 133, 139, 432 P.3d 669 (2019) ("'Investigatory detentions are generally permitted under the Fourth Amendment to the United States Constitution and K.S.A. 22-2402 if "an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime."'").

The reasonable suspicion standard requires consideration of "the totality of the circumstances—the whole picture . . . . Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18. A mere "hunch" is not enough to be a reasonable suspicion. *Terry*, 392 U.S. at 27. But the particularized basis need not rise to the level of probable cause, *Navarette v. California*, 572 U.S. 393, 397,

12

134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014), which """is the reasonable belief that a specific crime has been committed and that the defendant committed the crime.""" *State v. Fewell*, 286 Kan. 370, 377, 184 P.3d 903 (2008).

It is these legal principles that define our analysis of the district court's denial of Bates' motion to suppress. A well-settled, bifurcated standard of review applies to that analysis. Under the first part of the standard, an appellate court reviews a district court's factual findings to determine whether they are supported by substantial competent evidence. *State v. Scheuerman*, 314 Kan. 583, 593, 502 P.3d 502 (2022). Substantial competent evidence is defined as such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. *State v. Queen*, 313 Kan. 12, 20, 482 P.3d 1117 (2021). Appellate courts do not reweigh the evidence or assess credibility of witnesses when assessing the district court's findings. *Scheuerman*, 314 Kan. at 593. Under the second part of the bifurcated standard of review, appellate courts review de novo the district court's conclusion of law about whether a reasonable suspicion justifies the investigatory detention. 314 Kan. at 593.

Application of this bifurcated standard is at the heart of the parties' arguments. Bates asserts we must defer to the district court findings and to any conclusion of law supported by that substantial competent evidence. We agree only in part. As Bates suggests, if substantial competent evidence supports the findings, we grant deference to the district court to the extent that we do not reweigh evidence or judge the credibility. Rather, we accept the judge's factual findings when substantial evidence supports them. See 314 Kan. at 593. But we disagree with his suggestion that our de novo review requires us to defer to the district court's legal conclusion drawn from those facts. De novo review means we exercise unlimited review without deference to the legal conclusions of the district court. *State v. Sanchez-Loredo*, 294 Kan. 50, 54, 272 P.3d 34 (2012). In other words, "[t]he ultimate determination of the suppression of evidence is a

13

legal question requiring independent appellate review." *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007). Our role is to review the judge's findings of fact for substantial competent evidence and then independently apply those facts to determine whether the officers had a reasonable suspicion.

Neither Bates nor the State suggests any one of the district court judge's factual findings lacked the support of substantial competent evidence. Bates' quarrel thus is not that the Court of Appeals panel failed to fact check the district court findings. Instead, Bates faults the panel for failing to recognize that substantial competent evidence supports the judge's legal conclusion that the officers lacked reasonable suspicion. He also contends the panel should have deferred to the judge's conclusion because it had that factual support. But, again, that ignores de novo review.

Ironically, if we applied the standard Bates' proposes, our analysis would not lead to the outcome he seeks. The district court judge concluded: "Officers Oliphant and Gilmer could not have conducted a *Terry* stop because, according to their testimony, they did not believe a crime had been committed, was being committed, or was about to be committed." Our review of the record confirms they testified it was not a crime to ring a doorbell, even at 1:27 a.m., and that it was not a crime to park in an alleyway with your lights off. But we do not find support for a conclusion they did not believe the minivan occupants were not about to commit a crime. In fact, the officers often described Bates' conduct as suspicious, and they tied that suspicious behavior to patterns of criminal conduct.

Bates counters the officers' testimony about their suspicions by repeating the judge's conclusion that the officers admitted they saw no crimes committed, by examining each factor identified in the testimony individually, by suggesting each relates to a lawful activity, and by contending the actions are subject to innocent explanations.

14

These arguments attempt to persuade us to apply a probable cause standard by requiring an officer to articulate a belief a crime was committed. They also ignore the totality of the circumstances, especially those circumstances that can be innocently explained. *Terry* itself instructs that these arguments are incorrect.

In *Terry*, an officer watched men repeatedly walk back and forth, looking in a store window and talking to each other. The United States Supreme Court recognized that each of the acts was "perhaps innocent in itself," but the totality of the circumstances "warranted further investigation." 392 U.S. at 22. Those suspicious circumstances justified the officer's action of approaching the men and asking questions, even though he had not seen a crime committed.

Likewise, in *Sokolow*, 490 U.S. 1, the Court observed that individually the facts forming the proffered suspicion did not reveal a crime and were innocent when considered individually. The defendant had traveled under an alias, followed an evasive path through an airport, paid cash for plane tickets, and traveled from Honolulu to Miami where he stayed for about 48 hours. Despite the innocent nature of each act, the Court held that "taken together they amount to reasonable suspicion." 490 U.S. at 9. The Court observed that "'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.'" 490 U.S. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 [1983]).

In yet another illustrative case, *Arvizu*, 534 U.S. 266, the Court reversed a Court of Appeals conclusion that reasonable suspicion did not justify a border patrol agent from stopping a minivan because most of the 10 factors identified by the district court as part of the totality of circumstances were "readily susceptible to an innocent explanation [and thus] entitled to 'no weight.'" 534 U.S. at 274 (quoting *United States v. Arvizu*, 232 F.3d

15

1241, 1249-51 [9th Cir. 2000], *rev'd and remanded* 534 U.S. 266 [2002]). The Court rejected "this sort of divide-and-conquer analysis," noting: "The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase." 534 U.S. at 274.

Our caselaw mirrors these holdings. See *State v. Martinez*, 296 Kan. 482, 487, 293 P.3d 718 (2013) ("'Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious,' [ citation omitted], but to determine whether the totality of the circumstances justify the detention."); *Moore*, 283 Kan. at 354 (same); *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998) (same).

Here, contrary to the instruction of these cases, the district court judge focused on the fact the officers testified they observed no crime being committed. And while neither Officer Ryan Oliphant nor Officer Joshua Gilmer clearly stated that he formed a reasonable suspicion a crime had been or was about to be committed, they noted the behaviors they found suspicious and identified other factors that contribute to a reasonable suspicion. Their testimony conveys their belief they had a reasonable suspicion to investigate the actions of those in the minivan. But the judge did not discuss the totality of the circumstances that include:

- Both officers repeatedly referred to "suspicious" conduct by labeling the initial call as a "suspicious character call" because, in Officer Gilmer's words, having someone knock on a door at 1:27 in the morning made it suspicious. The district court judge agreed:

16

"Based on the information available to the officers, they knew that a dwelling occupant had an unknown and unwanted person at his door. The door knocking was at such a time that it would be reasonable to conclude that something was wrong—regardless of whether it involved crime—and that a citizen of the community wanted the police to deal with it. . . . Under the circumstances of this case, it was reasonable for both the 9-1-1 caller and the officers to conclude that something was amiss that should be looked into."

- The judge also found in his findings of fact 16 and 17 that both officers were aware of there being "a lot" of residential burglaries, larceny to autos, car break-ins, vandalism, and gang activity in the area. And on cross Officer Gilmer explained this pattern was occurring in the subject neighborhood around the time of this incident.

- As the judge found in finding 24, "Officer Gilmer has experienced cases of people knocking on a front door and then breaking into the rear of the home if no one answers the door." They had been involved with burglaries where the burglars had knocked to see if anyone was home.

- The judge found in finding 5 that Officer Gilmer arrived "shortly" after the 911 call. And in the text of his decision, the judge noted: "The responding officers saw only one possible source of the door knocking: the occupants of the vehicle." Then, in finding 27, the judge referred to Officer Oliphant having a "suspicion" the minivan was tied to the door knocking.

- When the minivan drove away, the officers searched for it and found it nearby, parked without its lights on in an overgrown alleyway that Officer Oliphant described as one "that's not traveled very much . . . and is mostly grass."

17

According to finding 31, "Officer Oliphant found it suspicious to be parked in an alley right off the street completely blacked out."

The Court of Appeals panel also discussed the reliability of the information relayed in the 911 call. It also noted: "And after Officer Gilmer attempted to approach the van, it drove away and parked with its lights off in a nearby alley, suggesting its occupants did not want to interact with police." 2021 WL 301896, at *4.

Bates argues both these conclusions required fact-finding by the panel. While it is true the district court judge did not explicitly discuss the reliability of the 911 call, he implicitly did so when he concluded that the officers "knew that a dwelling occupant had an unknown and unwanted person at his door." But we agree the panel engaged in fact-finding when it inferred the minivan occupants did not want to interact with police. The district court never found that the occupants knew police approached the minivan. And such a conclusion is not obvious from the record. Officer Gilmer explained that he parked his patrol car around the corner, it was dark when he walked toward the minivan with only his flashlight on, and he was wearing "soft clothes" that did not readily identify him as an officer. Under those circumstances, we agree with Bates that driving away was not on its own suspicious. But the circumstance of driving away and traveling only about a block and a half to park in an alleyway and turning off the minivan's lights helps explain Officer Oliphant's conclusion the behavior was suspicious.

We hold the totality of these circumstances provided "a 'particularized and objective basis' for suspecting legal wrongdoing"—in other words, a reasonable suspicion sufficient to justify an investigative detention. *Arvizu*, 534 U.S. at 273.

18

In doing so, we distinguish the totality of the circumstances from two somewhat analogous cases: *State v. Andrade-Reyes*, 309 Kan. 1048, 442 P.3d 111 (2019), and *Schreiner v. Hodge*, 315 Kan. 25, 504 P.3d 410 (2022).

In *Andrade-Reyes*, police approached two people sitting in a vehicle legally parked in an apartment complex parking lot late at night. The passenger seemed nervous and moved his hands. After holding that the initial encounter was a seizure and not a voluntary encounter, this court held the officers lacked reasonable suspicion of any criminal activity as required by *Terry*. 309 Kan. at 1058. As here, police did not observe any illegal activity. What is more, as here, the State said the fact that it was late at night in a high crime area was one of the factors supporting reasonable suspicion. 309 Kan. at 1058-59.

In *Schreiner v. Hodge*, the plaintiff sought monetary damages under various tort theories for an alleged wrongful detention. The detention happened after the plaintiff legally parked his vehicle on a residential street and walked into a wooded, public area, in the middle of the day. Someone called police and reported the unoccupied vehicle as suspicious. When the plaintiff returned to his vehicle, an officer detained him and prevented him from leaving. The officer observed nothing that suggested the vehicle had been involved in a crime, nor did he observe the plaintiff committing any crimes. He did consider hypotheticals involving potential criminal activity and knew other crimes had taken place in the area. Under the totality of the circumstances, we concluded the officer had no reasonable suspicion of criminal activity. 315 Kan. at 35.

A side-by-side comparison of this case with *Andrade-Reyes* and *Schreiner v. Hodge* highlights the fact-specific nature of determining reasonable suspicion. Just slight variations in circumstances can create reasonable suspicion even though somewhat analogous situations fail to rise to that standard. See *Arvizu*, 534 U.S. at 274-75 (noting

19

Court has "deliberately avoided reducing [the reasonable suspicion standard] to '"a neat set of legal rules"'" but observing that "[e]ven if in many instances the factual 'mosaic' analyzed for a reasonable-suspicion determination would preclude one case from squarely controlling another, 'two decisions when viewed together may usefully add to the body of law on the subject'").

Unlike the circumstances in *Andrade-Reyes* and *Schreiner v. Hodge*, the police suspected Bates or the other occupant of the minivan of ringing a stranger's doorbell at 1:27 a.m. As the district court judge stated: "Under the circumstances of this case, it was reasonable for both the 9-1-1 caller and the officers to conclude that something was amiss that should be looked into." And this specific—and unusual—practice followed a pattern seen in burglaries. The officers also felt it suspicious the minivan had driven to a nearby spot and parked with its lights off in a seldom-used alleyway. Granted, none of these circumstances—or all of them taken together—rule out innocent behavior. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277 (citing *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 [2000]).

In summary, each of the factors we have identified is no doubt alone susceptible of innocent explanation, none provide probable cause to believe a crime occurred, and some factors are more probative than others. Taken together and "remembering that reasonable suspicion represents a 'minimum level of objective justification,'" *DeMarco*, 263 Kan. at 735, they suffice to form a particularized and objective basis for a reasonable suspicion that Bates was about to commit a crime. The seizure of the minivan was thus reasonable under the Fourth Amendment and section 15.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.