NOT DESIGNATED FOR PUBLICATION

No. 125,824

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

ELIZABETH DIANE BLAKE,
*Appellee*.

# MEMORANDUM OPINION

Appeal from Johnson District Court; ROBERT G. SCOTT, magistrate judge. Oral argument held July 11, 2023. Opinion filed February 23, 2024. Reversed and remanded with directions.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellant.

*Russell L. Powell*, of Monaco Sanders, et al., of Leawood, for appellee.

Before ATCHESON, P.J., MALONE and PICKERING, JJ.

PICKERING, J.: The State appeals the district court's decision to grant Elizabeth Diane Blake's motion to suppress evidence in a prosecution for driving under the influence (DUI). The district court ruled there was too much uncertainty that the car law enforcement ultimately stopped was the same car that left the scene of an accident because the officer lost sight of the car for a minute or two on a desolate two-lane road between 2 and 3 a.m.

Under the totality of circumstances, we disagree that losing sight of the car for a minute or two when there was no other traffic on the road invalidated the stop. Therefore, we find the district court erred in granting Blake's motion to suppress. Accordingly, we reverse the order suppressing the evidence and remand for additional proceedings.

## FACTS

In March 2021, the State charged Blake with leaving the scene of an accident, DUI, and transporting an open container. Blake filed a motion to suppress, claiming "the evidence [was] illegally obtained in violation of Defendant's rights under the Fourth and Fourteenth Amendments to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights." The facts of the case were set forth at the hearing on Blake's suppression motion.

On a Sunday in February 2021, between 2 and 3 a.m., Sergeant David Rolfe and Corporal Zachary Roberts, both with the City of Gardner Police Department, were dispatched to answer a grass fire and suspicious activity call. They arrived at the intersection of 175th Street and Four Corners Road in Johnson County, which is just outside Gardner's city limits. Rolfe arrived first and saw that the fire was caused by downed power lines. The damaged power pole appeared to have been struck by a pickup truck, which was located further down the road.

There were two other vehicles in the area. One was traveling westbound on 175th Street and was quickly out of sight. The other was stopped in the westbound lane about 50 yards away from the scene, with its hazard lights blinking. Rolfe activated his vehicle's red and blue flashing emergency lights. Within three seconds the parked car turned off its hazard lights.

Rolfe then got out to investigate the crash and shortly discovered that there were no occupants in the wrecked pickup. At that moment, the nearby parked car pulled away. Rolfe directed Roberts, who was still in his vehicle back by the fire, to stop the car. Rolfe testified that, based on his experience, he thought the car was either directly involved in the collision or it had possibly picked up the driver of the crashed pickup.

The car leaving the scene of the accident disappeared over the hill before Roberts stopped it. Roberts testified that it took him a mile to catch up. In that mile, he saw no other vehicles in either direction. Rolfe's dashcam, presented at the suppression hearing, also indicated that no other vehicles were on the road at the time.

Roberts stopped the car and ultimately detained the passenger, Blake, on suspicion of DUI and leaving the scene of an accident. On cross-examination, Roberts admitted that he was not certain that the car he stopped was the car that had left the scene. He reiterated that no other vehicles had passed. He testified that he did not see the car that he stopped commit any traffic violations.

At the conclusion of the hearing, the district court ruled that reasonable suspicion existed to stop the car that left the scene of the accident, but because the State could not establish that the car stopped was exactly the same car that left the scene, it granted Blake's motion to suppress.

The State moved to reconsider under K.S.A. 2022 Supp. 60-259(f), arguing that the district court used the incorrect legal standard when it suppressed the evidence. The State contended that because the stop was an investigatory detention, the officers needed mere reasonable suspicion to stop the car, not a higher standard of "certainty" that the district court seemed to require.

The district court denied the State's motion to reconsider. The court ruled that stopping Blake's car was based on no more than "a hunch" because officers failed to maintain visual contact with the car between the scene of the accident and the seizure.

## ANALYSIS

The State challenges the district court's order suppressing evidence, including Blake's statements to law enforcement, results of her blood alcohol test, observations of the arresting officer, officer testimony, and all fruits thereof.

"On a motion to suppress, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo." *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021); see also *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015) (applying this standard of review on State's appeal after district court granted defendant's motion to suppress).

Both parties agree that the district court's factual findings were supported by substantial competent evidence. We are therefore left with the sole issue of determining whether the district court's legal conclusion was correct.

The Fourth Amendment to the United States Constitution protects the people from unreasonable searches and seizures. U.S. Const. amend. IV. Under this context, an officer is permitted "to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)." *Kansas v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1187, 206 L. Ed. 2d 412 (2020). "[I]nvestigatory detentions are constitutionally permissible if an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to

commit, or is committing a crime." *State v. Hanke*, 307 Kan. 823, 828, 415 P.3d 966 (2018). "To have reasonable suspicion to detain an individual, '[a] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Sanders*, 310 Kan. 279, 286, 445 P.3d 1144 (2019).

"Although a mere '"hunch"' does not create reasonable suspicion, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause. [Citation omitted.]" *Navarette v. California*, 572 U.S. 393, 397, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014); *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). "Reasonable suspicion is a lower standard than probable cause, and '[w]hat is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer.'" 305 Kan. at 1081.

In its brief, the State contends that the district court erred as a matter of law by requiring proof far beyond the applicable legal standard of reasonable suspicion—that of certainty. The district court appears to have required certainty that the car stopped was the same car that officers reasonably suspected of criminal activity. Responding, Blake argues that even if the car that was ultimately stopped was, in fact, the same car near the accident scene, there still would not be reasonable suspicion of criminal activity to stop it. In other words, she suggests that no evidence supported the conclusion that any occupant of the vehicle parked at the scene of the accident with its hazard lights blinking was committing or had committed any crime.

In *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000), the United States Supreme Court considered whether there was reasonable suspicion to support a *Terry* stop of an individual, Wardlow, who—"unprovoked"—took off running when he saw a patrol car driving through a known heavy narcotics trafficking

area. See *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Wardlow was pursued, was found with a firearm, and was arrested. Wardlow challenged his seizure, contending that the officers lacked reasonable suspicion to justify his seizure.

In determining whether there was reasonable suspicion to support Wardlow's seizure, the Court found that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." 528 U.S. at 124. The Court also found that "there are innocent reasons for flight from police and that . . . flight is not necessarily indicative of ongoing criminal activity." 528 U.S. at 125. However, the Court concluded that the combination of Wardlow's "presence in an area of heavy narcotics trafficking" and "his unprovoked flight upon noticing the police" provided officers with reasonable suspicion to detain Wardlow. 528 U.S. at 124. The Court continued:

> "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. [Citations omitted.]" 528 U.S. at 124-25.

In *Glover*, the United States Supreme Court considered the interplay between certainty and reasonable suspicion and the level required by an officer when conducting a traffic stop. There, an officer ran a truck's license plate and learned that the truck's registered owner, Glover, had a revoked license. Without confirming who was driving, the officer pulled over the truck. Glover—the driver—was charged with driving as a habitual violator. Glover moved to suppress the traffic stop, arguing that the officer

lacked reasonable suspicion when he initiated the traffic stop. At the district court, Glover won his suppression motion. Another panel of our court reversed, finding "the officer's common-sense inference gave rise to a reasonable suspicion." *State v. Glover*, 54 Kan. App. 2d 377, 385, 400 P.3d 182 (2017). Our Supreme Court reversed, finding the officer's "hunch . . . was unsupported by a particularized and objective belief." *State v. Glover*, 308 Kan. 590, 591, 422 P.3d 64 (2018). The State appealed to the United States Supreme Court. Regarding certainty, the *Glover* Court quoted *Wardlow*, 528 U.S. at 124-25: "Courts 'cannot reasonably demand scientific certainty . . . where none exists.'" *Glover*, 140 S. Ct. at 1188. The Court held that the investigative traffic stop was reasonable under the Fourth Amendment when the officer lacked information negating an inference that the owner was driving the vehicle. 140 S. Ct. at 1191.

Another panel of this court found, under very similar circumstances, officers had reasonable suspicion to stop a vehicle after losing sight of it for 60-90 seconds. In *State v. Long*, No. 106,137, 2012 WL 3135891 (Kan. App. 2012) (unpublished opinion), officers briefly lost sight of a vehicle suspected of having an alcohol-impaired driver after midnight in Newton, Kansas. The defendant's sole argument in her motion to suppress was that the officer did not have reasonable suspicion to stop her because he had lost sight of the car for a brief time. She argued: "'[T]he one thing that the officer didn't testify to was that it was the same vehicle. He didn't testify that the same vehicle he saw that [generated reasonable suspicion] was the one that he stopped.'" 2012 WL 3135891, at *2.

The *Long* panel held that an officer who lost sight of a car for up to 90 seconds after midnight in the Newton business district did not lose reasonable suspicion to make the stop. 2012 WL 3135891, at *3. Similarly, the officer here had objective facts suggesting that the car he stopped was the same one seen leaving the scene of the accident one to two minutes before.

Courts in other jurisdictions have also held that reasonable suspicion can be maintained even after officers lose sight of the vehicle in question. See *United States v. Torres*, 987 F.3d 893, 897, 902 (10th Cir. 2021) (finding stop reasonable even though officers "briefly" lost sight of vehicle and then relocated it less than a block away); *State v. Watts*, 223 So. 3d 1187, 1191 (La. Ct. App. 2017) (finding traffic stop justified even though officers lost sight of vehicle for few seconds and one city block); *United States v. Casasola-Seguero*, No. 2:22-cr-00079, 2023 WL 313905, at *5 (D. Vt. 2023) (unpublished opinion) (finding reasonable suspicion existed even though officer lost sight of vehicle for two minutes in rural area). But see *United States v. Jones*, 998 F.2d 883, 884-85 (10th Cir. 1993) (finding five minutes between sightings during afternoon in highly populated area did not support reasonable suspicion).

In this case, once Rolfe arrived at the scene and activated his lights, the parked vehicle near the scene turned off its hazard lights and moments later drove away from the accident, not stopping to engage with the officers. Rolfe then ordered Roberts to follow the vehicle. While pursuing the vehicle, Roberts did not pass any other vehicles in either direction. The pursuit occurred between 2 and 3 a.m. on a country road outside of Gardner, Kansas; and it took Roberts about a mile, or a minute or two, to catch up with the fleeing vehicle.

Blake argues that the State failed to meet its burden to prove reasonable suspicion because the officer did not see the car commit any traffic violations and that it could have been "any car"—seeming to say that losing sight of the car for a short time erased the officer's reasonable suspicion. We disagree. As illustrated in *Wardlow*, 528 U.S. at 125, and *Glover*, 140 S. Ct. at 1188, "we cannot reasonably demand scientific certainty from . . . law enforcement officers where none exists." Requiring the nexus between the reasonable suspicion and the seizure to be absolutely certain is error. Further, the officer did not lose reasonable suspicion during the one to two minutes of the vehicle pursuit. Even though the officer momentarily lost sight of the vehicle, it was for a short distance,

for a short time on an otherwise deserted road, thereby eliminating the possibility that the officer encountered a different vehicle. Notably, during Roberts' pursuit of the fleeing vehicle, the officer's camera shows no other vehicles on the two-way road.

Here, Rolfe based his suspicions on his experiences as a law enforcement officer, which included "commonsense judgments" regarding evasive behavior of a vehicle leaving the scene of a reported accident. See *Wardlow*, 528 U.S. at 125. Rolfe, after witnessing the vehicle in question turn off its hazard lights in response to his emergency lights and leave the scene, directed Roberts to pursue the fleeing vehicle.

Blake argues that accepting the premise that the vehicle stopped at the accident scene created reasonable suspicion for officers to stop it would "extend current case law to authorize the seizure of any vehicle, without any indicia of criminal activity, because the vehicle happened to be traveling in the vicinity of an accident and might contain an occupant who left the scene of the accident." To the contrary, the vehicle here was not merely traveling in the vicinity of an accident; it was stopped 50 yards or so from a crashed pickup, with its hazard lights blinking. As soon as Rolfe turned on his emergency lights, the vehicle turned off its hazard lights and pulled away. These facts, viewed in the totality of circumstances, would lead a trained law enforcement officer to suspect that the vehicle's occupants were committing or had committed a crime and consequently pursue the fleeing vehicle.

Finally, both parties cite *State v. Bates*, 316 Kan. 174, 190, 513 P.3d 483 (2022), a case in which our Supreme Court ultimately found that reasonable suspicion existed for a detention. The series of events in that case began with a 911 caller reporting an unwelcomed doorbell ringing of a home after 1 a.m. An officer quickly arrived and observed an occupied minivan near the home that drove away as the officer approached it on foot and shone a flashlight toward it. Another officer then spotted the minivan parked in a nearby alleyway with its lights turned off. The second officer activated his

emergency lights and detained the minivan and its occupants. Police suspected one of the occupants of the van of ringing the doorbell in the early morning in an area that had seen a recent pattern of burglaries. The officers also testified that they found it suspicious that the van had been driven to an overgrown alleyway where it parked with its lights off. The *Bates* court concluded that each factor alone was susceptible of innocent explanation, but, in the totality of circumstances, the officers had reasonable suspicion to seize the van. 316 Kan. at 190.

The State argues that *Bates* is similar to this case because the mere possibility of innocent behavior by the driver does not invalidate the stop. Blake points out that unlike *Bates*, here there is no evidence about the time the pickup crashed, who made the 911 call, or when the call was made. But because "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," the officers still had reasonable suspicion without these factors. See *Wardlow*, 528 U.S. at 125. There is very little likelihood that the car stopped was other than the car leaving the scene of the accident.

We appreciate the dissent's historical overview of Fourth Amendment jurisprudence. But we would be remiss if we did not emphasize that in determining the existence of reasonable suspicion, what is reasonable depends on the totality of the circumstances in the view of a trained law enforcement officer. See *Bates*, 316 Kan. at 190.

Looking at the facts here, we note that Roberts did not stop "ordinary citizens going about their ordinary business," as the dissent suggests. Slip op. at 15. Rather, he was pursuing the car that had just left the accident scene, and the wrecked pickup's driver was nowhere to be found. Once Rolfe walked over to the wrecked pickup, the car parked nearby with flashing hazard lights turned off its hazard lights and drove away from the

scene, with no attempts by the occupant(s) to speak to either of the officers. Roberts then pursued this car and stopped

- the first and only car that he saw which was being driven
- between 2 and 3 a.m.
- on a Sunday morning
- on a two-lane country road
- on the outskirts of Gardner, Kansas,
- on the same country road that the pursued car was traveling.

The officer stopped this car

- a mile away from the scene
- after only a one- or two-minute pursuit.

And during this pursuit, the officer did not see any other cars on the same two-lane country road. Under the totality of these circumstances, the officer articulated sufficient reasonable suspicion to stop the car in which Blake was a passenger.

To conclude, we hold that the investigatory stop was supported by reasonable suspicion and Blake was therefore legally detained. We reverse the district court's order suppressing the evidence and remand for further proceedings.

Reversed and remanded with directions.

***

MALONE, J., concurring: I concur with the majority opinion that the district court erred in granting Elizabeth Diane Blake's motion to suppress the evidence. In *Terry v. Ohio*, 392 U.S. 1, 20-23, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the United States Supreme Court held that a law enforcement officer may detain and briefly question a person if the officer has a reasonable suspicion based on specific and articulable facts that the person has committed, is committing, or is about to commit a crime. This law is codified in Kansas at K.S.A. 22-2402(1). I find under all the circumstances here that Sergeant David Rolfe and Corporal Zachary Roberts had reasonable suspicion to stop the car occupied by Blake to investigate the crime of leaving the scene of an accident.

The majority opinion accurately summarizes the facts, so I will not repeat them here. The district court ruled that Rolfe had reasonable suspicion to order Roberts to stop the car that left the scene of the accident. All three judges on this panel agree with that legal conclusion. But the district court suppressed the evidence because Roberts was unsure that the car he stopped was the same car that left the scene. The dissent agrees with that ruling but the majority finds it was incorrect. On appeal, both parties agree the district court's factual findings were supported by substantial competent evidence. Thus, the lawfulness of the car stop presents a legal question subject to this court's unlimited review. *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021).

The dash camera video from Rolfe's patrol car is an important exhibit, and the video aligns with the testimony presented at the hearing on the motion to suppress. Rolfe was on 175th Street in rural Johnson County between 2 and 3 a.m. investigating the scene of a one-vehicle accident that apparently started a grass fire. Other than the patrol cars driven by Rolfe and Roberts and the unoccupied crashed pickup truck, there were only two other vehicles in the area when Rolfe arrived. One was traveling westbound on 175th Street and was quickly out of sight. The other was stopped in the westbound lane about 50 yards from the pickup truck with its hazard lights blinking (the subject vehicle).

The subject vehicle turned off its hazard lights about three seconds after Rolfe activated his emergency lights. The subject vehicle pulled away from the accident scene about one minute and nine seconds into the video, and Rolfe immediately ordered Roberts to follow and stop the car. Roberts' patrol car left the scene about 30 seconds later with its emergency lights flashing. Roberts estimated that it took him about 1 mile or "a minute or two" to overtake and stop the car occupied by Blake. In that mile, Roberts saw no other vehicles in either direction. The rest of the 12-1/2-minute video showed only one other nonemergency car pass by the accident scene.

The video shows that it was very dark and there was no way for either Rolfe or Roberts to describe the subject vehicle from their distance. The officers could only see the subject vehicle's rear lights before it pulled away, and there was nothing about the lights that made the vehicle readily identifiable. Roberts did not know what kind of car he had been ordered to stop, and he stopped the first and only car he overtook on the road. Based on the evidence presented, it was reasonable for him to do so.

It was between 2 and 3 a.m. and there was almost no traffic on the road. We can see enough from the beginning of the video to tell that the accident scene was on a rural stretch of road that typically has a crossroad every mile. Maybe Roberts passed a crossroad before he came upon the car that he stopped. And maybe there were also some private driveways along the road. It would have been better for the State to have elicited testimony from Roberts about these possibilities. But the evidence the State presented shows this was an isolated stretch of road with almost no traffic in the middle of the night. It took Roberts a minute or two and about 1 mile to come upon the car occupied by Blake. It was the only other car on the road. Roberts had more than a mere hunch that the first car he overtook on the road was the subject vehicle he had been ordered to stop. With the collective knowledge of both law enforcement officers, together with all reasonable inferences from those facts, Roberts had a reasonable suspicion that he was stopping the right car. See *State v. Niblock*, 230 Kan. 156, 161, 631 P.2d 661 (1981)

(recognizing the knowledge of one officer is imputed to fellow officers). In fact, not only was it objectively reasonable for Roberts to suspect he was stopping the same car that had left the accident scene one or two minutes earlier, but it was likely he was doing so.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures by law enforcement. These rights are fundamental and must be safeguarded by the courts. But a car stop is a "minimal intrusion [on our liberties], simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). The possibility that Roberts may have stopped the wrong car does not invalidate the stop or make it unlawful. To show reasonable suspicion for an investigatory stop, the State need not rule out the possibility that the suspect may be engaged in innocent conduct. 528 U.S. at 125.

Reasonable suspicion does not conform to a concise definition or a precise quantification. It is a lower standard than probable cause, and "'[w]hat is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer.'" *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. The district court suppressed the evidence against Blake "[b]ecause [Roberts] was uncertain as to whether or not this was the right car." But Roberts did not need to be certain; he only needed reasonable suspicion that he was stopping the right car. Even if the State were required to show that the vehicle Roberts stopped was more probably than not the subject vehicle that left the accident scene, as the dissent advocates, I believe the State would have met this standard. As a result, the district court erred in granting Blake's motion to suppress the evidence.

* * *

ATCHESON, J., dissenting: This case tests the limits of what amounts to a reasonable suspicion permitting government agents to detain and question ordinary citizens going about their ordinary business in ways that may appear unusual or because they may bear some resemblance to a criminal suspect. The majority concludes the circumstances here pass the test. I say not and, therefore, dissent from the decision to reverse the Johnson County District Court's ruling suppressing evidence used to prosecute Defendant Elizabeth Diane Blake for driving under the influence after she apparently struck a utility pole with a pickup.

The evidence presented at the suppression hearing showed that a police officer then stopped another motor vehicle in which Blake was a passenger based only on his guess or hunch—not on articulable facts establishing reasonable suspicion necessary for an investigatory detention. The stop, therefore, cannot be squared with protections against unreasonable governmental searches and seizures extended to all citizens in the Fourth Amendment to the United States Constitution. More broadly, however, the majority's rationale would materially expand the scope of investigatory detentions by misapplying the reasonable suspicion standard, a misapplication both sides encouraged in the district court and continue to advance on appeal.

But the vehicle stop violated the Fourth Amendment under both the proper construction of the reasonable suspicion standard and the more relaxed version the majority applies. Either way, the district court reached the correct conclusion and should be affirmed.

To analyze the issue, I first outline relevant Fourth Amendment principles and then outline the facts shown at the suppression hearing. Next, I apply those legal rules to the factual record in the way the parties and the majority have framed the constitutional issue. I separately discuss the weaknesses in the majority's case authority. Finally, I look

at the issue using a framework truer to the Fourth Amendment's protections against undue governmental intrusiveness.

*Fourth Amendment Principles*

The Fourth Amendment's prohibition on unreasonable searches and seizures represents a bulwark against overbearing and oppressive governmental actions invading a basic right of privacy belonging to every citizen. The framers of the Constitution saw the Fourth Amendment as a fundamental freedom, given abuses of British authorities in conducting largely unchecked raids on Colonists' homes and businesses—an abuse central among the grievances sparking the Revolutionary War. See *Payton v. New York*, 445 U.S. 573, 583-85 & n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) ("It is thus perfectly clear that the evil the [Fourth] Amendment was designed to prevent was broader than the abuse of a general warrant. Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language . . . of the Amendment."); *Stanford v. Texas*, 379 U.S. 476, 482, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965) (noting antipathy toward both use of writs of assistance in the Colonies and use of general warrants to suppress dissenting political voices in England as animating inclusion of Fourth Amendment in the Bill of Rights); *Boyd v. United States*, 116 U.S. 616, 624-27, 6 S. Ct. 524, 29 L. Ed. 746 (1886) (detailed discussion of British abuses prompting inclusion of Fourth Amendment in Bill of Rights); see also 1 LaFave, Search and Seizure § 1.1(a) (6th ed. 2020).

In service of the prohibition on unreasonable searches and seizures, the Fourth Amendment typically requires government agents to get a judicially issued warrant grounded in probable cause authorizing any action. But the courts have recognized some narrowly defined governmental searches and seizures to be constitutionally reasonable absent a warrant. In *Terry v. Ohio*, 392 U.S. 1, 20-22, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the United States Supreme Court held that a brief warrantless detention of a

person based on reasonable suspicion may be constitutionally acceptable to investigate criminal activity.

In investigatory or *Terry* stops, government agents may detain and briefly question a person if they have a "reasonable suspicion" based on articulable facts that the individual has committed, is committing, or may be about to commit a crime. See *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *Terry*, 392 U.S. at 21-23, 30. The suspicion of criminal involvement cannot rest on mere hunches or speculation, but an agent may rely on training and experience to deduce nefarious implications from the circumstances that those outside the law enforcement field might view as entirely innocuous. See 392 U.S. at 22-23, 27; *State v. Beltran*, 48 Kan. App. 2d 857, 863, 300 P.3d 92 (2013). In this context, reasonable suspicion doesn't conform to a concise definition or a precise quantification. Although less demanding than probable cause, reasonable suspicion requires at least some objective facts. See *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989); *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017); *State v. Toothman*, 267 Kan. 412, Syl. ¶ 5, 985 P.2d 701 (1999). As with much else in Fourth Amendment law, reviewing courts consider the totality of the circumstances in assessing reasonable suspicion. *Kansas v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1191, 206 L. Ed. 2d 412 (2020); *Toothman*, 267 Kan. 412, Syl. ¶ 5.

*What We Know and Don't Know in This Case*

A district court, likewise, should consider the totality of the circumstances established in the evidence admitted during the hearing on a defendant's motion to suppress to determine if law enforcement officers had reasonable suspicion for an investigatory detention. *Sharp*, 305 Kan. at 1081. The State bears the burden of proving the constitutional propriety of a search or seizure by a preponderance of the evidence.

*State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). We examine the district court's decision under a bifurcated standard, assessing whether the factual findings are supported by substantial competent evidence and, in turn, reviewing the ultimate legal conclusion without deference. 304 Kan. at 274.

Here, the hearing evidence shows that Gardner Police Sergeant David Rolfe and Corporal Zachary Roberts separately responded around 2 a.m. on a Sunday morning in February 2021 to a dispatcher's report of a grass fire just outside the city limits. Rolfe arrived first; Roberts followed in short order. They both testified at the hearing on Blake's motion to suppress evidence. They were the only witnesses to testify, and the district court also received a dash-cam video. As depicted in the video, there are no streetlights along the road, so the scene was quite dark.

The officers saw that a pickup had gone off the road and struck a utility pole. Presumably an electrical wire from the pole ignited the comparatively small grass fire. As they arrived, a car drove by on the road. Rolfe looked for and could not find the driver or any other possible occupant of the pickup. Both officers saw a motor vehicle parked at an angle up the road with its rear lights flashing. Neither officer apparently could make out any identifying characteristics of the motor vehicle, such as its make, color, or body design, e.g., a sedan or SUV, let alone a license plate. They knew it was what the majority describes as a "car" rather than a box truck or some other larger commercial motor vehicle. But that's about all.

The motor vehicle pulled out and drove away. That caused Rolfe to suspect someone in the vehicle had some association with the mishap they had begun to investigate. Based on more than 20 years in law enforcement, Rolfe found that witnesses to an accident or Good Samaritans happening on the scene routinely engage with first responders, including law enforcement officers. So Rolfe suspected the departing motor vehicle either had some involvement in the pickup going off the road or was spiriting

away the driver of the pickup or (I presume) both. Rolfe, therefore, directed Roberts to identify the motor vehicle—a command Roberts took to mean stopping the vehicle. I will, therefore, refer to the departing vehicle as the "subject vehicle."

Roberts took off down the road. But the subject vehicle quickly crested a hill, and he lost sight of it. But within a minute or two—Roberts' testimony is vague about the precise time—he overtook and stopped a car. He testified the car was being driven lawfully, so he didn't stop it for a traffic infraction. The car wasn't traveling at an excessive speed or otherwise engaged in what could be characterized as "evasive behavior" or "[h]eadlong flight" of the kind the United States Supreme Court recognized might contribute to reasonable suspicion of criminal involvement. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). The majority's reliance on *Wardlow* is inapposite in justifying the stop itself in contrast to Rolfe's suspicion about the subject vehicle they saw briefly parked at the scene.

It's apparent from Roberts' testimony he stopped the first car he encountered and did so precisely because it was the first car. Roberts didn't testify that the car he stopped bore some resemblance to the subject vehicle. For example, he wasn't asked and didn't say that the configuration of the rear lights on the two vehicles were the same or even similar. There is a whole lot else we don't know from the record of the suppression hearing. We have no idea how fast Roberts drove from the scene as he intercepted the car, so we don't know how much ground he covered. We don't know how many cross streets there were along that stretch or other places where the subject vehicle could have turned off or another vehicle could have turned onto the road. Roberts didn't know how fast the subject vehicle was traveling. At a high rate of speed, it easily could have overtaken and passed other vehicles traveling in the same direction. Roberts did not describe the topography of the road, so we don't know if there were other hills that obscured his line of sight and his ability to see motor vehicles that might have been farther down the road. In his testimony, Roberts did not outline some reasonable

suspicion he entertained derived from his law enforcement training and experience or other circumstances that caused him to conclude the car he stopped was the subject vehicle.

As it turned out, the car Roberts stopped was the subject vehicle. Blake was in the front passenger seat, and her sister was driving. The detention of Blake yielded incriminating evidence—the precise nature of which was irrelevant to the suppression hearing and remains so in this appeal—prompting the State to charge Blake with driving under the influence, a misdemeanor violation of K.S.A. 2020 Supp. 8-1567, and leaving the scene of a motor vehicle accident, a misdemeanor violation of K.S.A. 2020 Supp. 8-1602.

Blake filed a motion to suppress the evidence on the grounds Roberts' stop of the car violated the Fourth Amendment. The district court agreed with Blake, and the State has properly sought an interlocutory appeal under K.S.A. 2022 Supp. 22-3603.

*The Fourth Amendment Issue as Framed by the Parties*

On appeal, the State contends the district court failed to treat Roberts' vehicle stop as an investigatory or *Terry* detention requiring reasonable suspicion and, in turn, erred in finding a Fourth Amendment violation. Blake agrees that Roberts had to have a reasonable suspicion to stop the car he had overtaken on the road. She says he didn't. For purposes of the appeal, there doesn't appear to be any material dispute about the underlying facts. The propriety of the stop and attendant search, therefore, presents a question of law we examine without deference to the district court's determination. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010) (appellate court exercises unlimited review over question of law); *State v. Mejia*, 58 Kan. App. 2d 229, 231-32, 466 P.3d 1217 (2020) (when material facts are undisputed, issue presents question of law; no deference given to district court). Likewise, we may affirm a district court that comes to

the correct result, albeit through a flawed analysis. See *State v. Holley*, 315 Kan. 512, 520, 509 P.3d 542 (2022).

Although the parties have misframed the constitutional issue, I initially look at their presentation before turning to what I see as the proper Fourth Amendment framework in this circumstance. Under either approach, the district court reached the right conclusion in granting the motion to suppress.

Based on his extensive experience in law enforcement, Rolfe entertained a reasonable suspicion either: (1) The driver of the subject vehicle may have had some connection to the pickup hitting the utility pole and, therefore, some liability for a traffic infraction in causing the mishap through bad driving; or (2) the driver of the subject vehicle was aiding the driver of the pickup in leaving the scene of an accident, also a traffic infraction. He, therefore, had a constitutionally sufficient basis to make a *Terry* stop of the subject vehicle. Under the collective-knowledge doctrine, Rolfe's determination may be imputed to Roberts. See *State v. Miller*, 49 Kan. App. 2d 491, 496-97, 308 P.3d 24 (2013) (outlining collective-knowledge doctrine); see also *State v. Niblock*, 230 Kan. 156, 161, 631 P.2d 661 (1981) (recognizing doctrine without describing its contours). So, as the parties present the issue, Roberts had the authority to make an investigatory stop of a motor vehicle he had a reasonable suspicion to believe was the subject vehicle.

But Roberts never claimed such a reasonable suspicion. And, more pertinently, the factual circumstances he described in his testimony do not objectively support such a suspicion. Roberts simply stopped the first car he overtook as he pursued the subject vehicle. That's no more than a happenstance or, at best, some kind of hunch. But there were no articulable facts that drew Roberts to the car he stopped other than its travel on the same road and in the same direction as the suspect vehicle. Although there was little other traffic at that late hour, Roberts testified to nothing about the car he stopped that

would suggest it was the subject vehicle. The stop, then, amounted to a constitutionally impermissible seizure followed by an equally impermissible search. The district court, therefore, properly granted the motion to suppress.[1]

[1] Perhaps the State could have elicited testimony or presented other evidence at the suppression hearing that would have inched closer to a reasonable suspicion. For example, as I have suggested, were there no cross streets along the route, there would have been no place the subject vehicle easily could have turned off the road or another car likely would have entered the roadway, save from a driveway. Likewise, if Roberts had a clear view of the road for an extended distance ahead and saw no other motor vehicles, that would have suggested the car he stopped was, in fact, the subject vehicle and not simply a car the subject vehicle had passed in departing the scene. We have no way of knowing if any of that might have been true. And we cannot infer those sorts of facts from a silent record. I do not mean to suggest that such evidence necessarily would have created a reasonable suspicion. The proposition is hypothetical, and the conclusion would depend on variables such as the number of cross streets and whether they were major or minor roadways. But that sort of testimony, depending on its detail, certainly could have enhanced the State's position.

This appeal also typifies in an unfortunately negative way the paradox of protecting everybody's Fourth Amendment rights through the exclusionary rule. When government agents violate a criminal defendant's Fourth Amendment rights, the courts typically preclude the State from using any seized evidence to convict that person. *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate.'"). The exclusionary rule aims to deter unconstitutional searches and seizures in the first place by depriving government agents of any benefit, i.e., inculpatory evidence, they might realize. So those agents will not act indiscriminately and impermissibly to detain anyone, thereby protecting innocent citizens—who would never be criminally charged and would have nothing to suppress because they had done nothing wrong. The protection, however, necessarily comes at the cost of impeding, if not

precluding, the successful prosecution of the guilty. See *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (The exclusionary rule is "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'") (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]); *State v. Moore*, No. 119,521, 2020 WL 2602056, at *12-13 (Kan. App. 2020) (unpublished opinion) (Atcheson, J., concurring in part and dissenting in part) (explaining deterrent effect of exclusionary rule as means of protecting Fourth Amendment rights of innocent persons).

That paradox cannot deflect us from enforcing the constitutional protections of the Fourth Amendment. The importance of this appeal lies not nearly so much in the fate of Blake as in the erosion of the Fourth Amendment barrier against unreasonable governmental intrusions into the quotidian comings and goings of the ordinary and the innocent, as when they drive down a roadway late at night.

*The Majority's Inapposite Case Authority*

The majority attempts to bolster its conclusion that Roberts had reasonable suspicion to stop the car he overtook by citing a series of cases involving motor vehicle stops, including *State v. Bates*, 316 Kan. 174, 513 P.3d 483 (2022), and *State v. Long*, No. 106,137, 2012 WL 3135891 (Kan. App. 2012) (unpublished opinion). The cases are distinguishable and, to the extent they have some legal bearing, suggest the lack of reasonable suspicion here.

For example, in *Bates*, the Wichita police received a nighttime 911 call about a prowler in a residential area knocking on doors. The first responding officer considered the described behavior consistent with a burglar assessing whether anyone might be home at the targeted residences. The officer spotted a red minivan nearby with the lights on and the motor running. The minivan drove away as the officer approached it. He and a second

officer located the same red minivan about a minute later parked in a nearby alley with its lights off. The second officer blocked the alley with his patrol car. The officers smelled marijuana when they then came up to the minivan. A search of the minivan yielded illegal drugs and paraphernalia.

Defendant Carlos Bates filed a motion to suppress the seized drugs and paraphernalia on the grounds the officers lacked reasonable suspicion to associate the red minivan with any incipient criminal activity that would, in turn, permit an investigatory detention of the occupants of the red minivan. The Kansas Supreme Court found sufficient evidence of crime being, in the words of *Terry*, "afoot" and a reasonable suspicion to link the red minivan with that criminality, especially given what appeared to be the evasive behavior of the driver. *Bates*, 316 Kan. at 188; see *Terry*, 392 U.S. at 30. Apart from setting out many of the Fourth Amendment principles I have already outlined, *Bates* is inapposite. It was undisputed the officers recognized the minivan they investigated in the alley to be the same one they saw on the street near the residences related to the 911 call. The sole issue was whether that one and only minivan reasonably could be suspected of harboring apparent burglars. In short, what was undisputed in *Bates* is at the heart of the dispute here.

The facts and the disputed legal issue in *Long* aren't as far afield, but the case doesn't support the majority's decision. There, around midnight, a Newton police officer saw a white, four-door Nissan followed by another car, whose driver was obviously trying to attract his attention. The driver of the second car told the officer his wife was driving the white Nissan and described her as intoxicated. The officer briefly lost sight of the white Nissan but received a radio call of a matching car and caught up to that white Nissan in an otherwise largely traffic-free downtown Newton, given the late hour. The officer estimated he made the traffic stop within 60 to 90 seconds after first seeing the white Nissan. The driver was, indeed, the wife of the man who had flagged down the officer, and she was, indeed, legally intoxicated. After being charged with driving under

the influence, the woman moved to suppress the evidence developed through the traffic stop.

In denying the motion to suppress, the district court found the officer had a reasonable suspicion to stop the white Nissan, even though he briefly lost sight of the white Nissan that first passed by him. We affirmed the ruling. The *Long* decision would be supportive of the majority's position if Roberts had testified that the car he stopped was the same color, make, and general body style (e.g., a four-door) as the subject vehicle that left the scene. But Roberts could not identify even one common characteristic.

The majority also discusses at some length the United States Supreme Court's decision in *Glover* to prop up the notion Roberts had a reasonable suspicion for stopping the car he overtook. But the analytical fit is wrong. In *Glover*, the Court held that a law enforcement officer could infer or assume the person driving a motor vehicle to be the registered owner in forming a reasonable suspicion to make an investigatory stop, at least absent some specific evidence otherwise—say, for example, that the registered owner was a 50-something individual and the driver plainly looked to be a teenager. 140 S. Ct. at 1188, 1191. The conclusion does not entail an evidentiary presumption but simply a reasoned inference based on common experience and understanding. 140 S. Ct. at 1188; see *Brown v. Vannoster*, No. 120,376, 2019 WL 5485149, at *4 (Kan. App. 2019) (unpublished opinion) (evidentiary presumption entails statutory or common-law rule that if Fact A has been proved, then Fact B may be presumed true). But the lesson of *Glover* is a limited one tied to the circumstances of using registered owner information to infer who may be driving a motor vehicle. 140 S. Ct. at 1191 ("We emphasize the narrow scope of our holding."); 140 S. Ct. at 1194 (Kagan, J., concurring) (characterizing *Glover* as a "strange case" resting "on a barebones stipulation" without additional facts that might alter the outcome in "more fully litigated cases").

The *Glover* decision would be helpful here if there were some comparable reasoned assumption across the run of cases that the first motor vehicle a pursuing law enforcement officer encountered would be the object of the pursuit. But there is no such assumption, and nobody, including Roberts, has purported to rely on that sort of generalized suspicion as support for the investigatory stop here.

The majority briefly cites three cases from other jurisdictions that are no more helpful. Two of them factually present counterpoints suggesting why Roberts lacked reasonable suspicion the car he stopped was the subject vehicle. The third is simply beside the point.[2]

[2] In *United States v. Torres*, 987 F.3d 893 (10th Cir. 2021), a police officer in Las Cruces, New Mexico, staked out an apartment suspected to be a drug house. A white SUV illegally parked near the apartment, and a woman went into the apartment for about a minute. As she returned to the SUV, the surveillance officer requested a second officer to ticket the SUV for illegal parking. As the second officer approached the white SUV, the vehicle drove off. The officer lost direct sight of the SUV for less than a block and then stopped it. Ultimately, the officers searched Ronald Torres, the driver, and found a handgun. Torres was charged in federal court with unlawful possession of a firearm, and he moved to suppress the handgun as the product of an unconstitutional search and seizure. Although there was vehicular traffic in the area, the officer testified both that he was sure the white SUV was the same one he had seen parked a block away and that he saw no other white SUVs in the immediate vicinity. The court concluded the officer had both reasonable suspicion and probable cause to stop the white SUV for a traffic infraction for illegal parking. 987 F.3d at 902. The officer's identification of the white SUV as the suspect vehicle was based on articulable facts tied directly to the vehicle's physical characteristics.

In *State v. Watts*, 223 So. 3d 1187 (La. Ct. App. 2017), a pair of New Orleans police officers on afternoon patrol saw a black GMC SUV going the wrong way on a one-way street and then turn the wrong way on another one-way street. The officers drove on a parallel street for a block losing site of the black SUV for what one officer testified was "'a few seconds.'" 223 So. 3d at 1191. They immediately saw an identical black SUV in the parking lot of a fast-food restaurant. As the officers drove up, the black SUV pulled out and began a series of maneuvers speeding up, abruptly braking, and speeding up again and swerving across the roadway. The black SUV then almost came to a complete stop but sped away before finally stopping. The police recovered a handgun

from the black SUV. Anthony Watts, the driver, was charged with unlawful possession of the firearm and filed a motion to suppress the handgun as the product of an unlawful stop. Watts argued because the officers momentarily lost sight of the wrong-way black SUV, they had no basis for approaching or stopping the black SUV he was driving since there would have been many like vehicles in New Orleans. The district court and the Court of Appeals were unpersuaded and found reasonable suspicion for the officers' stop, given the detailed description of the black SUV and the exceptionally short time the vehicle was out of sight. 223 So. 3d at 1191.

In *United States v. Casasola-Seguero*, No. 2:22-cr-00079, 2023 WL 313905, at *4 (D. Vt. 2023) (unpublished opinion), the district court mentioned in passing that an experienced federal border patrol agent working in rural Vermont along the Canadian border did not keep Defendant David Casasola-Seguero's car in sight for about two minutes during an extended surveillance displaying numerous indicia of illegal smuggling of undocumented aliens into the United States. The agent stopped the car and found four passengers Casasola-Seguero had just picked up were undocumented aliens. The agent's brief loss of direct observation of the car had nothing to do with the grounds on which Casasola-Seguero sought to suppress the evidence against him and did not figure in the district court's analysis of the factual or legal bases supporting the stop. 2023 WL 313905, at *3 (defendant's argument for suppression); 2023 WL 313905, at *4-5 (court's analysis). In short, there was no dispute the agent watched the same car throughout the surveillance. The district court outlined numerous circumstances that reasonably led the agent to conclude Casasola-Seguero was engaged in illegal smuggling. So the majority has treated a factoid of no apparent significance to the parties or the court in that case as if it were a material consideration in the outcome.

The majority has puffed up its conclusion with inapposite cases that neither support reversing the district court's ultimate ruling here nor justify the diminution of Fourth Amendment protections its decision to reverse causes.

*The Fourth Amendment Issue as Properly Framed*

As I have outlined, a *Terry* stop or investigative detention entails government agents acting on a reasonable suspicion of criminal activity—past, present, or incipient—and a person or persons associated with that activity. There are, then, two components to the detention: criminality and a suspect. A government agent acts within constitutional boundaries based on a reasonable suspicion as to one or the other component but not

both. So an agent may entertain a reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur coupled with firm evidence to conclude the person detained is involved in that activity; *or* the agent may have firm evidence to conclude criminal activity is afoot and a reasonable suspicion that the person detained has a connection to the activity.

Conversely, pyramiding reasonable suspicions to allow the detention and questioning of a person, even briefly, because a government agent merely suspects criminal activity *and* merely suspects that person might be associated with that maybe crime ventures into the realm of unreasonableness precluded under the Fourth Amendment. In those circumstances, there is too much speculation and not enough substance. The result more resembles the product of a dragnet or a prohibited general warrant permitting almost indiscriminate detention of individuals well divorced from solid grounds to conclude they may be immediately associated with nefarious conduct. See *Payton*, 445 U.S. at 583-85 (Fourth Amendment drafted to preclude general warrants permitting "indiscriminate searches and seizures"); *Davis v. Mississippi*, 394 U.S. 721, 726-27, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969) ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'"); *United States v. Sanchez*, 519 F.3d 1208, 1214 (10th Cir. 2008) (dragnet affords government agents "excessive discretion to stop and search a large number of citizens"); Black's Law Dictionary 135 (11th ed. 2019) ("dragnet arrest" noted as "sweeping" and "illegal" detention of people based on unsupported suspicion or belief).

The facts of *Terry* are illustrative of the dual components of an investigatory detention:

> "[A] veteran detective watched two men over about a 10-minute span as each walked back and forth in front of a business half a dozen times and peered in as he passed. They

> conferred between their trips and briefly spoke with a third man, who they then followed down the street. While that activity was not itself unlawful, it would have been unusual by any account. To the detective, however, it was criminally suspicious, for, as he later explained, the men appeared to be casing the business preparatory to a robbery. He stopped all three men after they had regrouped down the street, questioned them, and then searched them. Two of the men illegally had handguns for which they were prosecuted. The detective relied on the coordinated and out-of-the-ordinary conduct of three men that to an experienced law enforcement officer potentially signaled a criminal plot afoot. The conclusion—derived directly and solely from the men's own actions—amounted to a reasonable suspicion of an incipient armed robbery. *Terry*, 392 U.S. at 23." *Schreiner v. Hodge*, 55 Kan. App. 2d 50, 71, 407 P.3d 264 (2017) (Atcheson, J., concurring in part and dissenting in part), *aff'd* 315 Kan. 25, 504 P.3d 410 (2022).

The detective had more than a hunch that a robbery was about to happen and had no doubt based on his observations who the would-be robbers were. There was no compounding of reasonable suspicions to stop an individual of, at best, tenuous connection to the impending crime. More commonly, law enforcement officers have strong evidence of a recent crime—say a burglary or, like in *Terry*, a robbery—reported by the victim or a reliable witness and a description of the perpetrators; an officer then stops and questions someone generally fitting the description. See, e.g., *State v. Walker*, 292 Kan. 1, 11-12, 251 P.3d 618 (2011); *State v. Glass*, 40 Kan. App. 2d 379, 385-87, 192 P.3d 651 (2008).

Because of the immediate investigatory purpose, a *Terry* stop by its very design escapes the warrant requirement of the Fourth Amendment and any prospective judicial review. See *Terry*, 392 U.S. at 20. Accordingly, there must be other safeguards against abusive deployment of investigatory detentions. As implied in *Terry* and other cases, government agents may not "stack" reasonable suspicions to detain individuals no more than *suspected* of engaging in no more than *suspected* crime. Either the criminal activity or the individual's involvement in the otherwise questionable activity must be established as a historical fact to permit an investigatory detention.

The government bears the burden of proving the constitutional propriety of any search or seizure by a preponderance of the evidence. And that burden covers the relevant historical facts. So when the government relies on a reasonable suspicion to establish one component of an investigatory detention, it must prove the other by a preponderance of the evidence. Each of those determinations, of course, depends upon judicial examination of all of the circumstances in assessing whether the appropriate evidentiary burden has been met.

Without belaboring the evidence presented at the suppression hearing, Roberts' testimony fails to show that the motor vehicle he stopped was more probably than not the subject motor vehicle that left the accident scene—the proper standard, since the State offered only reasonable suspicion of criminal activity. The district court, therefore, properly would have granted the motion to suppress on that basis had the issue been so framed.